UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

**DECISION AND ORDER**
12-CR-83S (1)(2)(3)

ERNEST GREEN,
     a/k/a "Ern,"
RODSHAUN BLACK,
     a/k/a "Rashaun Black" a/k/a "Shaun,"
DANIEL RODRIGUEZ,
     a/k/a "Danny,"

           Defendants.

# I. INTRODUCTION

The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI.  The speedy trial guarantee "is as fundamental as any of the rights secured by the Sixth Amendment."  Klopfer v. North Carolina, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967).  Citing this fundamental protection, Ernest Green, Rodshaun Black, and Daniel Rodriguez (collectively "Defendants"), each of whom had been subject to continuous pretrial detention approaching six years, moved to dismiss the superseding indictment against them just before their more than 11-week trial.  (Docket Nos. 605, 607, 615.)  Because this Court finds that Defendants' Sixth Amendment rights have been violated, their motion is granted, and the remaining charges in the superseding indictment are dismissed with prejudice as to each of them.

# II. BACKGROUND

On October 31, 2017, Defendants and co-defendant Amilcar Ramos proceeded to

1

trial on a 9-count superseding indictment.   (Docket Nos. 155, 625.)   Counts 1 through 5 related to the robbery, extortion, kidnapping, and murder of Jabril Harper ("the Harper counts").   In Counts 1 and 2, Defendants and Ramos were charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2.   In Count 3, Defendants and Ramos were charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2.   In Count 4, Defendants were charged with discharge of a firearm causing death, in violation of 18 U.S.C. §§ 924 (j)(1) and 2.   And in Count 5, Defendants and Ramos were charged with the use, brandish, and discharge of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii), (iii) and 2.

Counts 6 through 9 of the superseding indictment related to the robbery, extortion, and kidnapping of Morris Singer, and charged only Green and Black ("the Singer counts"). In Counts 6 and 7, Green and Black were charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2.   In Count 8, Green and Black were charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2. In Count 9, Green and Black were charged with the possession and brandish of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii) and 2.

On the eve of trial, Green filed the instant speedy-trial motion, which Black and Rodriguez subsequently sought to join.   (Docket Nos. 605, 607, 615.)   The parties agreed to the issuance of a scheduling order and to resolution of the motion after trial. (Docket No. 632.)   Briefing concluded on December 13, 2017, after which this Court

reserved decision.[1]

Approximately one month later, on January 17, 2018, the jury returned a partial verdict under Rule 31 (b) of the Federal Rules of Criminal Procedure, after deliberating for seven days. (Docket Nos. 740, 743.) It acquitted Green and Black on the Singer counts and acquitted Ramos on all counts against him. (Id.) After further deliberations the following day, the jury remained hung on the Harper counts against Defendants. (Docket No. 741.) This Court therefore declared a mistrial without objection. (Id.) Re-trial is now scheduled for March 13, 2018. (Docket No. 764.)

Further detailed discussion of the procedural history of this case is necessary to properly assess Defendants' speedy-trial motion.

## A.    Magistrate Judge Proceedings

### 1.    The Indictment

#### a.    Arrest through Arraignment

On February 23, 2012, the government filed a criminal complaint charging Green with a single count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951. (See United States v. Green, 12-mj-2037, Docket No. 1.) At that time, Green was a state prisoner confined at the Auburn Correctional Facility. (Docket No. 702, Exhibit B.) Due to the lodged federal charges, the state released Green to federal custody on February 24, 2012, where he has remained in pretrial custody since, now just shy of six full years. (Id.) Green made his initial appearance before the magistrate judge on March 5, 2012. (See

---

1 The briefing relevant to Defendants' motion is found at Docket Numbers 605, 607, 615, 629, 690, 697, 698, 701, and 702.

<u>United States v. Green</u>, 12-mj-2037, Docket No. 3.)

The next day—March 6, 2012—the grand jury returned a single-count indictment against Green, Black, and Rodriguez, charging them with Hobbs Act conspiracy in violation of 18 U.S.C § 1951 (a). (Docket No. 1.) With Green already in custody, law enforcement arrested Rodriguez on March 7, 2012, and Black, who was already in state custody serving a state sentence, on March 8, 2012. (Docket Nos. 8, 9.) Like Green, Rodriguez and Black [2] have been in pretrial detention since their arrests, again approaching almost six years.

The magistrate judge conducted Defendants' arraignments on March 7 (Rodriguez), March 9 (Green), and March 13, 2012 (Black). At Rodriguez's arraignment, the government, in moving for detention, alerted the court and counsel that this would likely become a capital case, triggering the need for learned counsel. (March 7, 2012 Minute Entry.)

By the end of March 2012, the magistrate judge had arraigned the defendants, appointed learned counsel, and issued a pretrial scheduling order.

### b. Discovery

On March 9, 2012, the magistrate judge directed that all discovery be completed by April 9, 2012. (March 9, 2012 Minute Entry.) On April 9, 2012, the government moved for a two-week extension of the discovery deadline due to the prosecutor's vacation time and the further need to secure discovery from law enforcement agencies.

---

[2] Black has intermittently been back and forth between serving his state sentence and submitting to pretrial detention on his federal charges.

(Docket No. 10.)   The magistrate judge granted the government's motion and extended the discovery deadline to April 30, 2012.   (Docket No. 11.)

On April 19, 2012, Defendants collectively moved to adjourn the pretrial motion deadline until after the government returned its Notice of Intent to seek the death penalty, at which time counsel would know what kind of case they would need to defend.   (Docket No. 14.)   On April 25, 2012, the magistrate judge vacated all pretrial deadlines in anticipation of resetting them at a status conference set for May 11, 2012, to discuss the government's Notice of Intent.   (Docket No. 17.)   The May 11 status conference did not occur, however, because the government failed to produce the defendants.   (May 11, 2012 Minute Entry.)   The magistrate judge therefore rescheduled it for May 17, 2012. (Id.)   When the parties appeared on that date, the magistrate judge extended the motions deadline to July 28, 2012, in anticipation of the government's death-penalty determination.   (May 17, 2012 Minute Entry.)

On July 24, 2012, Defendants again collectively moved to extend their deadline to file motions pending the government's Notice of Intent concerning the death penalty. (Docket No. 23.)   Therein, counsel recounted that "based on conversations between co-counsel and [the prosecutor], the Department of Justice is currently considering this issue and is expected to issue (or indicate that it will decline to issue) a notice of intention to seek the death penalty within the next 60 days."   (Id.)   After conducting another status conference on August 2, 2012, at which the government reported expecting a death-penalty decision in October, the magistrate judge again extended the pretrial schedule, setting a new motions deadline of September 28, 2012.   (August 2, 2012 Minute Entry.)

### c.    Motion Practice

Defendants filed pretrial motions by the September 28, 2012 deadline, even though the government had not yet filed its Notice of Intent.   (Docket Nos. 31-35.)   The government thereafter moved for a 10-day extension of its October 26, 2012 deadline due to the prosecutor's military commitments.   (Docket No. 36.)   The magistrate judge granted the government's motion.   (Docket No. 37.)   The parties completed briefing and appeared for oral argument on December 4, 2012, at which time the magistrate judge resolved several issues, set new deadlines for supplemental discovery, and discussed Defendants' requests for a speedy trial and the government's timeline for a death-penalty decision, which the government reported was "proceeding" within the Department of Justice.   (December 4, 2012 Minute Entry; Transcript of December 4, 2012 Status Conference, Docket No. 674, pp. 15-16.)

Defendants thereafter filed a series of suppression and other motions on December 28, 2012.   (Docket Nos. 42-44.)   Twenty-eight days later, the magistrate judge issued a scheduling order.   (Docket No. 45.)   Briefing and motion practice continued.   On June 7, 2013, the magistrate judge issued another scheduling order pertaining to several of the pending motions.   (Docket No. 78.)   On June 21, 2013, the government moved to extend its June 21, 2013 deadline to comply with the court's previous order by two weeks due to the prosecutor's military commitments.   (Docket No. 79.)   The magistrate judge granted an extension until July 5, 2013.   (Docket No. 80.)

On August 14, 2013, the magistrate judge determined that evidentiary hearings were necessary to resolve several of Defendants' motions.   (Docket No. 82.)   The court

scheduled those hearings to take place 50 days later, on October 2, 2013.   (Id.)   On September 30, 2013, the government moved to adjourn the October 2, 2013 evidentiary hearing on the basis that the prosecutor's father-in-law had passed away and he was also engaged in another trial.   (Docket No. 83.)   The magistrate judge granted the government's motion and rescheduled the evidentiary hearing for November 6, 2013. (Docket No. 84.)   But the hearing did not go forward as scheduled, because the government's witness was unavailable.   (Docket No. 87.)   The magistrate judge therefore rescheduled the hearing for December 3, 2013, but that hearing also did not go forward, because the government failed to produce Black for the proceeding.   (Docket Nos. 87, 89.)   The magistrate judge then rescheduled the hearing for December 20, 2013, but the government again failed to produce Black for the proceeding, which had to be rescheduled for a third time to February 19, 2014.   (Docket Nos. 89, 92.)   The hearing finally occurred on February 19, 2014, 140 days after it was originally scheduled. (Docket No. 95.)

At the conclusion of the February 19, 2014 hearing, the magistrate judge set another follow-up hearing for March 7, 2014, while the parties continued to explore a missing photo array.   (Docket No. 96.)   On March 7, 2014, the magistrate judge set a schedule for additional motions related to the missing photo array and other missing discovery, with final briefing due on April 10, 2014.   (Docket No. 96.)   Black timely filed his motion (Docket No. 100), while Rodriguez moved for a 3-week extension due to his attorney's workload (Docket No. 102), which the magistrate judge granted, setting April 14, 2014, as the new deadline.   Green did not file a supplemental motion, in part perhaps,

because he and his attorney were experiencing communication difficulties. (Docket Nos. 98, 104.)

On April 11, 2014, Rodriguez moved for a second extension of his deadline to file supplemental motions based on the fact that the government had discovered and produced the missing photo array, which a retired law enforcement officer had taken home. (Docket Nos. 106, 111.) In response, the magistrate judge vacated the scheduling order and set a status conference for April 18, 2014, to discuss further briefing. (Docket No. 109.) Defendants filed supplemental motions concerning the photo array on April 21 and 23, 2014. (Docket Nos. 111-113, 116.) After full briefing, the parties appeared before the magistrate judge on May 27, 2014, at which time the court directed counsel to confer as to any remaining issues and appear again on June 6, 2014. (Docket No. 131.) On June 6 and 27, 2014, the parties reported that the remaining discovery disputes were largely resolved, including the missing photo array. (Docket Nos. 132, 137.) In all, the missing photo array and litigation related thereto consumed the period from at least February 19 through June 27, 2014.

The magistrate judge then set a briefing schedule for any further suppression motions related to the latest discovery, culminating in oral argument scheduled for August 18, 2014. (Docket No. 137.) After granting a 1-day adjournment sought by Black's counsel for scheduling purposes, the magistrate judge held oral argument on August 19, 2014, and reserved decision. (Docket No. 148.) Three days later, the magistrate judge determined that an evidentiary hearing was required to resolve the submitted motions, which the court scheduled for October 14, 2014. (Docket No. 149.) The magistrate

judge later adjourned the hearing to October 28, 2014, at Black's request.   (Docket Nos. 150, 151.)   At the conclusion of the hearing on October 28, 2014, the magistrate judge ordered post-hearing briefing and reserved decision.[3]   (Docket No. 153.)

### 2.    The Superseding Indictment

On December 12, 2014, some two years and nine months after the return of the initial indictment, the grand jury returned a superseding indictment adding the Singer counts against Green and Black and adding Amilcar Ramos and John Coronado as defendants on the Harper counts.   (Docket No. 155.)

### a.    Arraignment through Discovery

On January 13, 2015, the government finally informed the parties and the magistrate judge that the government would not be seeking the death penalty against any of the defendants.   (Docket No. 178.)   This notification came two years and ten months after the government first reported that it was determining whether to seek the death penalty.

By January 21, 2015, the magistrate judge had arraigned the defendants and issued a pretrial order for completion of discovery for Ramos and Coronado, with a new post-hearing submission deadline for Black of April 1, 2015.   (Docket No. 164.)   The court also discussed the age of the case, particularly with Green.   (Id.)   And on February 3, 2015, the magistrate judge held a status conference to discuss Green's concerns about

---

[3] The magistrate judge ordered the parties to file their post-hearing briefs within 30 days of the filing of the hearing transcript.   (Docket No. 153.)   The court reporter filed the hearing transcript on December 15, 2014.   (Docket No. 154.)   The magistrate judge later suspended the scheduling order after the return of the superseding indictment.   (Docket No. 162.)

his length of detention and his dissatisfaction with his lawyer. (Docket No. 168.) This discussion resulted in the magistrate judge relieving Green's lawyer and assigning him a new one. (Docket Nos. 168, 175.) Also during this time, Rodriguez challenged his detention and conditions of confinement (Docket Nos. 172-174, 176, 177, 181) and the government sought the removal of learned counsel (Docket Nos. 179, 180, 184, 187, 189). All of this occurred within the new discovery period.

### b. Motions

On March 30, 2015, Green filed an omnibus motion. (Docket No. 191.) Both Black and Rodriguez moved for 30-day extensions, which the magistrate judge granted, extending the deadline for motions and post-hearing briefs to May 1, 2015. (Docket Nos. 192-195.) Black and Rodriguez thereafter timely filed their motions and post-hearing briefs. (Docket Nos. 199-201.) The magistrate judge held oral argument on the motions on June 3 and 17, 2015, and set a further evidentiary hearing for July 14, 2015. (Docket Nos. 207, 212, 217.)

At the conclusion of the July 14, 2015 hearing, the magistrate judge ordered the parties to file post-hearing briefs within 45 days of the filing of the hearing transcript. (Docket No. 217.) The court reporter filed the hearing transcript on August 13, 2015, which made the parties' post-hearing submissions due by September 28, 2015. (Docket No. 222.) The attorneys for both Green and Black moved for a 10-day extension of time, which the magistrate judge granted. (Docket Nos. 224, 225, 227.) Green filed his post-hearing brief on October 9, 2015, but Black and Rodriguez again moved for additional time. (Docket Nos. 230, 232, 233.) The magistrate judge granted their motions and

10

reset the deadline for submissions to October 21, 2015, which Rodriguez again moved to extend, resulting in a further deadline of November 4, 2015.   (Docket Nos. 234, 236, 237.)   On October 30, 2015, the attorneys for Black and Rodriguez moved for a 60-day extension of the November 4, 2015 deadline due to their trial schedules.   (Docket No. 245.)   The magistrate judge granted their motion and reset the deadline to January 7, 2016.   (Docket No. 246.)

Rodriguez timely filed his post-trial submission, but Black did not.   (Docket Nos. 248, 249.)   The magistrate judge then sua sponte granted Black an additional 12 days to file his submission or seek a further extension to do so.   (Docket No. 249.)   Black filed his post-hearing brief on January 20, 2016, which finally completed the briefing on Defendants' pretrial motions.   (Docket No. 252.)

Immediately after the filing of Defendants' post-hearing submissions, the magistrate judge was confronted with several motions to determine conflicts of interest involving Green and Coronado.   (Docket Nos. 253, 259.)   Because the conflict-of-interest motions could have impacted the post-hearing submissions, the magistrate judge did not take the pretrial motions under advisement until after the conflict-of-interest motions were resolved on June 8, 2016.   (Docket Nos. 284, 292.)

B.     **District Judge Proceedings**

On July 6, 2016, the magistrate judge issued a 57-page Report and Recommendation and Decision and Order resolving the parties' pretrial motions. (Docket Nos. 301, 302.)   Any objections to the Report and Recommendation were due by July 20, 2016.   Defendants first sought a 44-day extension of time to file objections

based on the complexity of the pretrial issues.   (Docket Nos. 303, 305-308.)   This Court granted the extension and reset Defendants' deadline to September 2, 2016.   (Docket Nos. 304, 309.)   Defendant Green then timely filed his objections to the Report and Recommendation (Docket No. 318), while Black and Rodriguez sought a further 30-day extension of the deadline due to complexity (Docket Nos. 315, 317).   This Court granted Defendants' motions and extended the deadline 28 days to September 30, 2016. (Docket No. 319.)

On September 23, 2016, the magistrate judge entered an order acknowledging that Green's attorney had unexpectedly passed away.   (Docket No. 325.)   The magistrate judge thereafter appointed Green new counsel, his third.   (Docket Nos. 329, 337.)

On September 27 and 28, 2016, counsel for Black and Rodriguez moved for an additional 60-day extension of time within which to file objections to the magistrate judge's Report and Recommendation, citing difficulty accessing their clients because they were housed outside of the district.   (Docket Nos. 326, 327.)   This Court granted Defendants' motions and extended their deadline to November 30, 2016.   (Docket No. 331.)

On November 29, 2016, Rodriguez sought an additional 60-day extension of time due to personal family circumstances involving his attorney.   (Docket No. 350.)   Black joined Rodriguez's extension request, again citing client-access issues.   (Docket No. 351.)   This Court granted Defendants' motions and extended their deadline to January 30, 2017.   (Docket Nos. 353, 361.)

On January 25, 2017, counsel for Rodriguez and Black sought further 30-day

extensions of their time within which to lodge objections to the Report and Recommendation based on their unavailability. (Docket Nos. 385, 386.) On January 31, 2017, this Court granted Defendants' motions and extended their deadline to March 1, 2017. (Docket No. 388.) In the interim, Rodriguez filed his objections on January 30, 2017. (Docket No. 387.) Black timely filed his objections on February 27, 2017. (Docket No. 396.)

On March 2, 2017, with objections having been filed, this Court issued a scheduling order requiring the government to respond to the objections by March 20, 2017. (Docket No. 397.) The government moved for a 9-day extension of its response deadline, which this Court granted on March 21, 2017, extending the government's deadline to March 29, 2017. (Docket Nos. 402, 403.) The government filed its response on March 29, 2017, and Defendants timely filed their replies. (Docket Nos. 404, 406, 407, 408, 411.)

On April 26, 2017, this Court resolved the parties' objections to the Report and Recommendation and Decision and Order and discussed the parties' preparedness for trial. (Docket Nos. 415, 416, and 418.) It further set a scheduling order on Defendants' outstanding motions for severance. (Docket No. 417.) Counsel and Defendants next appeared on May 25, 2017, at which time this Court discussed numerous issues with counsel and set trial for October 31, 2017, the soonest mutually acceptable date for the court and counsel. (Docket No. 431.)

After resolution of all pretrial matters, including severance, the case proceeded to trial as scheduled on October 31, 2017. (Docket No. 625.) At that time, Green had been in pretrial detention for 5 years, 8 months, and 8 days; Black had been in pretrial

detention for 5 years, 7 months, and 24 days; and Rodriguez had been in pretrial detention for 5 years, 7 months, and 25 days.

## III. DISCUSSION

Defendants argue that dismissal of the remaining counts in the superseding indictment is required because their Sixth Amendment rights to a speedy trial have been violated. They do not assert violations of their statutory speedy-trial rights under the Speedy Trial Act, 18 U.S.C. § 3161, et seq.[4] (See Docket No. 605, p. 1.) The government maintains that Defendants' speedy-trial rights have not been violated.

### A. Sixth Amendment Right to a Speedy Trial

"In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend VI. This constitutional guarantee "is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. MacDonald, 456 U.S. 1, 8, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982); see United States v. Ewell, 383 U.S. 116, 120, 86 S. Ct. 773, 776, 15 L. Ed. 2d 627 (1966) (describing the speedy-trial guarantee as "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair

---

4 "Although unusual, it is possible for a delay that does not violate the [Speedy Trial Act] to run afoul of the Sixth Amendment's guarantee of a speedy trial." United States v. Stone, No. 05-CR-401, 2006 WL 436012, at *6 (E.D.N.Y. Feb. 22, 2006); see United States v. Pennick, 10-CR-191A, 2016 WL 4089192, at *2 (W.D.N.Y. Aug. 2, 2016) (finding constitutional violation in absence of statutory violation), aff'd, 16-3069-cr, 2017 WL 4994465 (2d Cir. Nov. 2, 2017).

the ability of an accused to defend himself").

Society has an interest in speedy trials as well. Speedy trials limit an accused's ability to leverage a court's backlog of cases to obtain a more advantageous plea resolution; protect the community by reducing a non-detained accused's opportunity to commit other crimes; shorten the time available to abscond; increase the opportunity for effective rehabilitation by minimizing delay between arrest and punishment; and reduce the expense and overcrowding concerns attendant to pretrial incarceration. See Barker v. Wingo, 407 U.S. 514, 519-20, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (explaining the societal interest as "exist[ing] separate from, and at times in opposition to, the interests of the accused"); United States v. Ghailani, 733 F.3d 29, 41 (2d Cir. 2013) (recognizing that "the public has an interest in quickly bringing defendants to trial to prevent a backlog of cases that might permit dangerous criminals to linger unsupervised for extended periods of time while on bail, delay rehabilitation, and otherwise hinder the criminal justice system").

Partly because of these often dueling interests, the speedy-trial right has been described as "amorphous," "slippery," and "necessarily relative." Barker, 407 U.S. at 522 (quoting Beavers v. Haubert, 198 U.S. 77, 87, 25 S. Ct. 573, 576, 49 L. Ed. 950 (1905)). "It is consistent with delays and depends upon circumstances." Beavers, 198 U.S. at 87. The right therefore cannot be measured in a finite number of days, months, or years, "largely because what may be considered 'speedy' is necessarily dependent on the nature of the trial and the parties' interests in the given case." Ghailani, 733 F.3d at 41; see Barker 407 U.S. at 521 ("It is . . . impossible to determine with precision when the

right has been denied. We cannot definitively say how long is too long in a system where justice is supposed to be swift but deliberate."); Ewell, 383 U.S. at 120 ("A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."); United States v. Ray, 578 F.3d 184, 191 (2d Cir. 2009) (noting that the right "neither prohibits all delays, nor establishes a strict time limit between the announcement of a charge and the commencement of trial").

Rather, a balancing test is employed to shape the contours of the speedy-trial right. The United States Supreme Court first set forth this test in Barker, where it outlined four factors to be weighed in assessing a speedy-trial claim: the length of delay; the reason for the delay; the defendant's assertion of his right; and prejudice to the defendant. 407 U.S. at 530. These factors must be considered together, as none alone has the "talismanic" quality sufficient to find deprivation of the speedy-trial right. Id. at 533. The Barker balancing process, to which this Court will soon turn, is difficult and sensitive, but must be carried out with "full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." Id. If the speedy-trial right is violated, dismissal of the charges with prejudice is mandatory. Strunk v. United States, 412 U.S. 434, 440, 93 S. Ct. 2260, 37 L. Ed. 2d 56 (1973).

Finally, the government and the court share the burden of bringing criminal cases to trial promptly. See United States v. New Buffalo Amusement Corp., 600 F.2d 368, 378 (2d Cir. 1979); United States v. Vispi, 545 F.2d 328, 334 (2d Cir. 1976). And where the delay is substantial, such as in this case, the government bears the burden of proving that the delay was justified and that the defendants' speedy-trial rights were not violated.

New Buffalo Amusement, 600 F.2d at 378; United States v. Tigano, No. 15-3073, 2018 WL 503281, at *7 (2d Cir. Jan. 23, 2018).

**B.    Barker Factors**

**1.    Length of Delay**

The length of delay is a triggering mechanism: "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530.  The Supreme Court recognizes delay approaching 12 months to be presumptively prejudicial.  See Doggett v. United States, 505 U.S. 647, 652, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992).  The time-to-trial in this multi-defendant case is 68 months, which is not only presumptively prejudicial, but "extraordinary."  See Barker, 407 U.S. at 533-34 (finding delay of "well over five years" extraordinary); see also New Buffalo Amusement, 600 F.2d at 377-79 (54-month delay "unquestionably substantial").

**2.    Reasons for the Delay**

The government and the court have affirmative duties "to monitor the progress of a criminal case toward disposition and to take steps to avoid unnecessary delay where possible." Tigano, 2018 WL 503281, at *7; see Vispi, 545 F.2d at 334 ("We have repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated and that it cannot escape this duty on the ground that the delay is for institutional reasons.") (citations omitted).  The reasons for delay are therefore carefully scrutinized, with different weight afforded to different reasons according to the type of delay. Barker, 407 U.S. at 530-31.  Three types of delay are recognized: deliberate;

17

neutral; and valid.  Id. at 531.  Deliberate delay designed to hamper the defense is weighted heavily against the government.  Id.  Neutral delays, such as negligence or overcrowded courts, are weighted less heavily, yet still against the government.  Id. Valid reasons for delay "are taken off the scale entirely."  Tigano, 2018 WL 503281, at *7.

Here, there has been no deliberate delay that this Court can detect.  Rather, the considerable delay is comprised of both valid and neutral delay.  As would be expected in a complex multi-defendant, multi-count, death-eligible case, valid delay predominates the almost six years of litigation.  Time is of course necessary to ensure the procedural safeguards due each defendant, and in this case, time was reasonably expended to conduct discovery, brief legal issues, address attorney-client matters, prepare for and conduct evidentiary hearings, honor military commitments, and accommodate personal circumstances.

But this case also suffered from significant neutral delay chargeable to the government.  The government's mishandling of the death-penalty determination, for example, caused unnecessary delay right from the start.  From the outset, the government identified this as a possible death-penalty case.  It then represented to the court and defense counsel on numerous occasions that it was in the process of determining whether it would seek the death penalty, which prompted the court to delay pretrial motions pending the government's decision.  But the government's representations proved inaccurate.  As Black's counsel explains in his unrebutted declaration, the prosecutor initially assigned to this case took no action whatsoever to

secure a death-penalty decision for more than two years, which is borne out by the timing of the Department of Justice's decision, which did not occur for some two years, ten months, and six days into the case. (Declaration of Donald M. Thompson, Esq., Docket No. 697, ¶¶ 2-4, 9.)

Delay chargeable to the government was also occasioned by its decision to supersede the indictment two years and nine months after it was initially returned. While the government possesses broad prosecutorial discretion, see Wayte v. United States, 470 U.S. 598, 607-08, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985), its decision to supersede the indictment on the eve of the running of the statute of limitations on the Singer counts caused delay. The government superseded the indictment just before the magistrate judge would have resolved Defendants' pretrial motions—which the government's death-penalty determination had already delayed by five months—and sent the case to this court for trial, about two years and nine months into the case. Instead, however, the return of the superseding indictment necessarily resulted in additional proceedings and delay, such that the magistrate judge did not resolve Defendants' pretrial motions until July 6, 2016, *four years and four months* after the case began. See United States v. Pennick, 16-3069-cr, 2017 WL 4994465, at *2 (2d Cir. Nov. 2, 2017) (finding delay attributable to the government for twice superseding the indictment).

The government's inability to coordinate its litigation obligations also resulted in chargeable delay. Five months were lost to the government's inability to coordinate law enforcement efforts, both in providing discovery and, most egregiously, in producing the

missing photo array. Another five and one-half months were lost to the government's inability to secure its witnesses and produce the defendants for pretrial hearings.

Finally, some institutional delay is chargeable to the government. At least four months (and probably more) were lost because defense counsel could not properly access their clients, who were housed out of state due to this district's lack of a federal detention facility. And approximately six months is chargeable for delays in issuing scheduling orders (one month), scheduling hearings (one month), and scheduling trial (four months). Institutional delays such as these are chargeable to the government. See Tigano, 2018 WL 503281, at *8-*11 (charging institutional delays attributable to the court, court staff, and the United States Marshal Service to the government); United States v. Carini, 562 F.2d 144, 149-50 (2d Cir. 1977) (finding institutional delays chargeable to the government).

To be sure, Defendants, particularly Black and Rodriguez, were also responsible for neutral delay.[5] Their extension and adjournment requests consumed some eight and one-half months. These requests were primarily premised on counsels' congested schedules and trial commitments, a circumstance common among this district's small pool of Criminal Justice Act panel attorneys. To some extent, the court may shoulder some responsibility for not "more aggressively manag[ing] the conduct of counsel." See Pennick, 2016 WL 4089192, at *8. In any event, these extensions contributed to the considerable delay in this case.

---

5 Despite having had three attorneys, Green was responsible for surprisingly little delay, making his Sixth Amendment claim even stronger than Black's and Rodriguez's.

### 3.    Defendant's Assertion of the Right

The effort a defendant makes to assert his speedy-trial right is closely related to the other factors in the test.    Barker, 407 U.S. at 532.    If a defendant is seriously being deprived of his right, he is more likely to vigorously assert it, and such an assertion is given strong evidentiary weight.    Id.    But the inverse is also true: failure to assert the right in a timely manner will be weighed against the defendant.    See id.; see also Rayborn v. Scully, 858 F.2d 84, 93 (2d Cir. 1988) (finding that a "lack of timeliness, vigor or frequency" in asserting speedy-trial rights undercuts a later claim). The Supreme Court makes clear that this inquiry is sensitive and complex, and must take into account how and when a defendant knew of the charges against him, if a defendant has obtained counsel, and if a delay benefits the defendant and thus dissuades him from invoking his right.    Barker, 407 U.S. at 528-29.

Here, Defendants' desire for a speedy trial was raised early and often.    For example, Defendants expressed their desire for a speedy trial to the magistrate judge on December 4, 2012.    (December 4, 2012 Minute Entry.)    They expressed continuing concern about trial delays in early 2014.    (Docket Nos. 110, 118.)    Several months later, the magistrate judge discussed the possibility of severance with counsel, due to their speedy-trial concerns.    (Docket No. 137.)    Green raised speedy-trial concerns again on January 21 and February 3, 2015, which prompted additional discussion of severance and replacement of his attorney.    (Docket Nos. 164, 168.)    Counsel additionally discussed delay at a status conference on June 3, 2015.    (Docket No. 207.)    And all defendants sought severance at one point or another.    (Docket Nos. 191, 201, 322, 417,

421, 422, 425-427, 500, 549.)   Thus, Defendants consistently asserted their rights to a speedy trial.   See United States v. Cain, 671 F.3d 271, 297 (2d Cir. 2012) (finding that consistent assertion of the speedy-trial right satisfies the third Barker factor).

### 4.    Prejudice to Defendant

Prejudice to the defendant is assessed in light of the interests the speedy-trial right is designed to protect.   Barker, 407 U.S. at 532.   The Supreme Court has identified three such interests: to prevent oppressive pretrial incarceration; to minimize anxiety and concern of the accused; and to limit the possibility that the defense will be impaired.   Id. The most serious of these interests is the last, because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system."   Id.   Yet the last factor need not always be present: "[a]ffirmative proof of impairment of the defense is not required in order to find a Sixth Amendment violation."   Tigano, 2018 WL 503281 at 12 (citing Doggett, 505 U.S. at 655 ("affirmative proof of particularized prejudice is not essential to every speedy trial claim").    But in most cases, the Second Circuit "generally require[s] a showing of some significant trial-related disadvantage in order to establish a speedy-trial violation."   Cain, 671 F.3d at 297; see New Buffalo Amusement, 600 F.2d at 379 (violation where witnesses crucial to defense could no longer be located, and other witnesses who previously had agreed to testify refused to do so); Vispi, 545 F.2d at 334-35 (violation where delay made locating old records and dealing with dimmed recollections "a formidable task"); United States v. Roberts, 515 F.2d 642, 646 (2d Cir. 1975) (violation where government's delay disqualified defendant for youthful offender status).

Addressing the first interest—the prevention of oppressive pretrial incarceration—there can be no doubt that Defendants are severely prejudiced by their 68-month pretrial detention, which is continuing and now stands at almost 72 months.[6] This length of detention greatly exceeds that found to support a speedy trial violation in Pennick (54 months), and is now approaching the longest-ever pretrial detention experienced by a defendant in the Second Circuit in Tigano (82 months). Like Tigano, Defendants were housed in local jails for significant periods, which is considered oppressive "dead time" due to the lack of recreation and rehabilitation programming in local facilities. Barker, 407 U.S. at 532-33; Tigano, 2018 WL 503281, at *12. Such onerous pretrial detention is precisely the type the speedy-trial right was designed to prevent. See Tigano, 2018 WL 503281, at *12.

As to the second interest—minimization of anxiety and concern of the accused—this Court has little trouble finding that Defendants were severely prejudiced. Defendants each experienced the common consequences of incarceration: separation from family; isolation; poor conditions of confinement; and distance from community; to name a few. Each of these causes anxiety and concern in their own right, particularly as the months turn to years. But Defendants here also suffered a graver source of anxiety and concern. For 1,043 days (more than 2 years and 10 months), Defendants arose each morning to face the specter of the death penalty anew. Facing execution by the

---

6 As noted, Black was (and is) serving a state sentence. His claim of prejudice on this point is therefore not as strong as Green's and Rodriguez's, who would not have been incarcerated but for the federal charges against them. Nonetheless, Black is prejudiced by the loss of the opportunity for any possible federal sentence to run concurrent to the undischarged portion of his state sentence.

state would cause even one with the strongest of constitutions anxiety and concern. Yet here, Defendants lacked even the benefit of certainty. They were instead left to wonder about the government's intentions and ponder the possibility of their executions, while the government took a rather cavalier approach to that prospect.[7] And even still, the government takes the remarkable position that its handling of the death-penalty aspect of this case is "immaterial." (Docket No. 690, p. 13.)

The government first reported that it might seek the death penalty at the very outset of the case, on March 7, 2012. (March 7, 2012 Minute Entry.) About one month later, Defendants sought to adjourn pretrial motions pending what they presumably believed would be a prompt death-penalty decision. (Docket No. 14.) The government therefore knew at the earliest stages that a timely death-penalty determination was required to move this case to trial efficiently and expeditiously. Indeed, the government was well aware that the magistrate judge twice stayed pretrial motions for the sole purpose of allowing the government to make this determination. (May 17, 2012 Minute Entry; August 2, 2012 Minute Entry.)

On August 2, 2012, the government reported that it expected a determination by October, which appears a misrepresentation in light of the government's failure to rebut Defendants' assertions that the government had not yet made any efforts to secure such a determination. In any event, no decision came in October. The government's

---

7 As noted, counsel for Black suggests that the prosecutor initially assigned this case took no action whatsoever to secure a death-penalty decision for more than two years, despite representing otherwise. (Declaration of Donald M. Thompson, Esq., Docket No. 697, ¶¶ 2-4, 9.) The government filed nothing to rebut this suggestion, resting instead on its assertion that "government counsel's handling of the death penalty issue . . . is immaterial to deciding this [speedy-trial] motion." (Docket No. 690, p. 13.)

timetable for its death-penalty decision was next discussed on December 4, 2012. But it was then another *two years and one month* before a decision came down, an inexcusable delay given the government's early representations. (Docket No. 178.) Meanwhile, Defendants sat knowing the government could seek their executions, but not knowing if it would. The anxiety and concern attendant to such circumstances is real and material, as it is exactly the type of toll the speedy-trial guarantee was intended to protect against.

Finally, as to the third interest—limiting the possibility that the defense will be impaired—Defendants do not allege any specific impairments impeding their ability to present a defense. Indeed, Green and Black successfully obtained acquittals on the Singer counts at trial and Defendants avoided convictions on the Harper counts by way of a hung jury. In any event, a particularized showing of impaired defense is not required to maintain a Sixth Amendment claim. See Tigano, 2018 WL 503281 at 12 ("Affirmative proof of impairment of the defense is not required in order to find a Sixth Amendment violation.")

## C.     Barker Balancing Test

The government bears the burden of proving that the substantial delay in this case was justified, and that Defendants' speedy-trial rights were not violated. New Buffalo Amusement, 600 F.2d at 378; Tigano, 2018 WL 503281, at *7. It has failed to do so. In this Court's view, consideration of the four Barker factors compels the conclusion that Defendants' Sixth Amendment speedy-trial rights have been violated: Defendants suffered prejudicial delay of 68 months (now 72 months and counting); the reasons for

the delays are charged principally to the government, though Defendants too caused delay;[8] Defendants consistently asserted their speedy-trial rights; and Defendants suffered the type of prejudice the Sixth Amendment was designed to prevent.  On the last point, in addition to the prejudice that arises from the sheer length and oppressive nature of Defendants' pretrial detention, Defendants suffered the unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measureable and one absent in the majority of criminal cases.   Viewed through the lens of the Sixth Amendment's speedy-trial right guarantee, the totality of these extraordinary facts warrant dismissal of the remaining counts of the indictment with prejudice.

## IV.  CONCLUSION

For the reasons stated above, this Court finds that Defendants' Sixth Amendment rights to a speedy trial have been violated.    Defendants' Motion to Dismiss the indictment on constitutional speedy-trial grounds is therefore granted.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendant Green's Motion to Dismiss (Docket No. 605) is GRANTED.

FURTHER, that Defendant Black's and Defendant Rodriguez's Motions to Join Defendant Green's Motion to Dismiss (Docket Nos. 607, 615) are GRANTED.

FURTHER, that the remaining counts in the superseding indictment are

---

8 This Court recognizes that "delay is not an uncommon defense tactic."   Barker, 407 U.S. at 521 (further noting that the deprivation of the speedy-trial right may sometimes work to the accused's advantage). Courts must therefore be wary of the defendant who seeks to use his speedy-trial right as both a shield and a sword by creating circumstances that may give rise to a constitutional speedy-trial violation.   Here, Defendants caused eight and one-half months of delay, as discussed, but there is no indication that they did so to create the speedy-trial violation found herein.

DISMISSED WITH PREJUDICE as to Defendants Green, Black, and Rodriguez.

FURTHER, that Defendants' pretrial detention will be maintained pending the status conference scheduled before this Court for tomorrow, February 9, 2018, at 9:00 a.m., at which this Court will further address Defendants' custody status pending any possible appeal.

SO ORDERED.

Dated:    February 8, 2018
          Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge